UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| EVAN LAMBERT, | CASE NO. 4:23-cv-2200 |
| *Plaintiff*, | **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES** |
| v. | |
| COLUMBIANA COUNTY, CITY OF EAST PALESTINE, JOHN C. HARRIS, JR., BRIAN MCLAUGHLIN, JENNIFER TUCKER, JAMES BROWN, III, AND DANIEL HAUETER, *in their personal capacities*. | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

## INTRODUCTION

1.      "[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). In that role, Evan Lambert ("Mr. Lambert"), a journalist for NewsNation, travelled to East Palestine, Ohio to cover the derailment of a train carrying toxic chemicals.

2.      On February 8, 2023, Mr. Lambert attended a news conference held by Ohio Governor Mike DeWine.  For his coverage of that event, Mr. Lambert would be arrested, assaulted, and charged with offenses that he did not commit.

3.      The incident began when Major General John C. Harris, Jr. of the Ohio National Guard—without authorization from the Governor and without justification—ordered Mr. Lambert to stop his live reporting on the press conference, became enraged, and instigated a one-sided physical confrontation.

4.      Rather than intervene to protect Mr. Lambert's First Amendment rights, officers of the Columbiana County Sheriff's Office (the "Sheriff's Office") and East Palestine Police Department ("EPPD") opted to punish him for his lawful newsgathering, with the approval and personal participation of the decisionmakers responsible for law enforcement policy in East Palestine and Columbiana County.

5.      As Governor DeWine made clear the same day, "[T]hat was wrong."

6.      Everything Mr. Lambert did that day, Ohio Attorney General Dave Yost explained in dismissing the charges against him, "was consistent with the event and his role as a reporter" at an event for which he was "lawfully present."

7.      That Mr. Lambert was nevertheless arrested, assaulted, and faced with meritless criminal charges was a product of EPPD and the Sheriff's Office's inadequate policies and training on the rights of journalists and the use of force.

8.       Mr. Lambert brings this action to redress his injuries and to ensure that he and other journalists covering matters of public concern in Ohio in the future can gather the news and inform the public safely, without fear that they will experience the same unlawful mistreatment that Mr. Lambert suffered that day.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over Mr. Lambert's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and supplemental jurisdiction over his Ohio state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy under 42 U.S.C. § 1983.

10.     Venue is proper in the Northern District of Ohio under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Mr. Lambert's claims occurred in this District.

## PARTIES

11.     Mr. Lambert is an Emmy-nominated and award-winning journalist with NewsNation, a subscription television news network owned by the Nexstar Media Group.  Mr. Lambert has worked for NewsNation since 2021.

12.     At all relevant times, Defendant Columbiana County (the "County") was and is a political subdivision as defined in Ohio Rev. Code § 2744.01 and a "person" subject to suit within the meaning of 42 U.S.C. § 1983.  The County is charged with the administration and operation of the Sheriff's Office, responsible for the employment, control, supervision, training, and discipline of Sheriff's Office personnel and employees.  It is also charged with the formulation of the policies, practices, and customs of Sheriff's Office personnel and employees.

13.     At all relevant times, Defendant City of East Palestine (the "City") was and is a municipal corporation under Article XVIII of the Ohio Constitution, and a "person" subject to suit within the meaning of 42 U.S.C. § 1983.  The City is charged with the administration and operation of the EPPD, responsible for the employment, control, supervision, training, and discipline of EPPD's personnel and employees.  It is also charged with the formulation of the policies, practices, and customs of EPPD's personnel and employees.

14.     Defendant Major General John C. Harris, Jr. is the Adjutant General of the Ohio National Guard.  He is sued here in his personal capacity.

15.     Defendant Brian McLaughlin has served as Sheriff of the Columbiana County Sheriff's Office since his election in 2020.  Under Ohio law, Sheriff McLaughlin acts as a final policymaker for the County "with respect to decisions to prosecute, charge, and arrest." *Ghaster v. City of Rocky River*, 913 F. Supp. 2d 443, 470 (N.D. Ohio 2012) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  The Sheriff's Office policies at issue in Mr. Lambert's unlawful mistreatment include Sheriff McLaughlin's signature, expressly identifying him as the source of authority for approval.  He is sued here in his personal capacity.

16.     Defendant Jennifer Tucker is the Chief Deputy of the Columbiana County Sheriff's Office.  She is sued here in her personal capacity.

4

17.     Defendant James Brown, III, has served as Chief of the East Palestine Police Department since 2017.  Under Ohio law and City custom, Chief Brown acts as final policymaker for the City with respect to EPPD practices around arrests, training, and discipline, including "policing at the individual level." *Jackson v. City of Cleveland*, 622 F. Supp. 3d 636, 643 (N.D. Ohio 2022).

18.     All of the relevant EPPD policies at issue in Mr. Lambert's unlawful mistreatment were initialed by Chief Brown as the approving policymaker; EPPD's policy on the use of force indicates that Chief Brown is the City policymaker charged with making a final determination whether a use of force complied with EPPD policy and the law; and the City's official statement on Mr. Lambert's arrest was communicated by Chief Brown.  No records produced to Mr. Lambert in response to a request under Ohio's Public Records Act indicate that any City official other than Chief Brown played a role in promulgating the relevant EPPD policies or in approving Mr. Lambert's unlawful arrest and prosecution.

19.     Chief Brown is sued here in his personal capacity.

20.     Defendant Daniel Haueter is a detective in the East Palestine Police Department.  He is sued here in his personal capacity.

## FACTUAL ALLEGATIONS

**I.**     **Mr. Lambert's Reporting Leads to His Unlawful Arrest.**

21.     On February 8, 2023, Mr. Lambert attended a news conference held by Ohio Governor Mike DeWine in connection with the high-profile toxic chemical train derailment in East Palestine, Ohio.  Governor DeWine was scheduled to speak at the East Palestine Elementary School gymnasium to address when residents living near the site of the derailment would be able to return home.

22.     Mr. Lambert had attended prior press conferences about the derailment earlier that week in the same space.  Those events were open to all members of the press; at no point did any state or local official communicate restrictions on the manner in which journalists could cover those conferences.

23.     Journalists attending the February 8 press conference were originally told the Governor's remarks would begin at 3:00PM, but by 5:00PM the event had not yet begun.  Whether or not the conference had started, Mr. Lambert was due to appear for a live report at 5:00PM in his role as a correspondent for NewsNation.

24.     Live shots are a conventional practice in broadcast journalism, and it is routine for live reports to be conducted before, after, or during a press conference.  Mr. Lambert had witnessed other journalists conducting live shots during media availabilities related to the derailment before the day in question.

25.    The Governor and his office had not restricted the use of live shots. As the Governor later explained, "It has always been my practice that if I'm doing a press conference, someone wants to report out there and they want to be talking back to the people back on channel, whatever, they have every right to do that."

26.    The EPPD and Sheriff's Office had not imposed—and had no authority to impose—restrictions on how the reporters in attendance could cover the Governor's remarks.  As an EPPD investigative report on Mr. Lambert's arrest would later explain, "local law enforcement were not tasked with the setting up of the press conference or the design of who was permitted to be in attendance."

27.    Just as the Governor walked out to begin his remarks, Mr. Lambert's host let him know through his earpiece that he was to begin the live report.

28.    Mr. Lambert began his appearance just as the Governor started speaking on the opposite side of the room.  As publicly available video of the appearance shows, Mr. Lambert spoke in an ordinary conversational tone to avoid disrupting the press conference.  He planned to keep his live report brief so that he would be able to hear the Governor and report any news coming from his remarks.

29.    Mr. Lambert would not have that opportunity.  Instead, as Mr. Lambert was giving his report, several law enforcement officers approached him. Major General John C. Harris, Jr., commanding general of the Ohio National Guard, began motioning at Mr. Lambert and the videographer with him to stop

broadcasting.  As General Harris became visibly exercised, Mr. Lambert signed off, explaining to viewers that he was being ordered to stop his live reporting.

30.     After Mr. Lambert signed off, General Harris began to shout at Mr. Lambert and his videographer, at first directing his ire at Mr. Lambert's colleague. Mr. Lambert quietly explained that the live shot had been scheduled before the Governor was delayed and could not have been cancelled at the last minute.

31.     General Harris continued to yell, calling it "rude" and a "shitty move" to broadcast while the Governor was speaking.  One of the other officers present, Sergeant Bridget Matt of the Ohio State Highway Patrol ("OSHP"), put her hand on General Harris's shoulder in an effort to get him to back away and calm down.

32.     Instead, without provocation, General Harris walked up to Mr. Lambert and pushed him in the chest.  In response, Mr. Lambert continued to explain that he was doing his job as a journalist by covering the press conference.

33.     Other officers had now gathered around Mr. Lambert and General Harris.  As body camera footage shows, Sergeant Matt stepped between General Harris and Mr. Lambert and told General Harris to "stop" several times; General Harris instead walked around her.  Sergeant Matt urged General Harris to step back, repeatedly saying, "Sir, please," in an effort to prevent him from escalating.

34.     Sergeant Matt was finally forced to put her hands on General Harris's chest to prevent him from "going for" Mr. Lambert, as she later explained in a

statement to EPPD that was recorded on body camera footage.  After she separated General Harris from Mr. Lambert, Sergeant Matt returned to the front of the gym.

35.     Shaken by General Harris's unprovoked aggression, Mr. Lambert commented to the other officers that had gathered there that General Harris had assaulted him, and that he was allowed to be at the Governor's press conference.

36.     Sheriff McLaughlin then told Mr. Lambert he needed to leave the press conference because he had been "told to shut it down and [he] continued on."

37.     When Mr. Lambert did not leave the event, Sheriff McLaughlin became visibly upset and repeatedly yelled at Mr. Lambert to "Go. Now."

38.     Getting closer and closer to Mr. Lambert's face, Sheriff McLaughlin asked twice if Mr. Lambert "wanted to go to jail for criminal trespassing."

39.     In a calm voice, Mr. Lambert responded that he was still "trying to listen" to the Governor's press conference and asked Sheriff McLaughlin if he knew "how quickly our lawyers will get me out" of jail for an unlawful arrest.

40.     Sheriff McLaughlin responded, "I don't care."

41.     Detective Haueter nodded in agreement and echoed, "We don't care."

42.     Even at the time, as Detective Haueter explained in an investigative report provided to Mr. Lambert in response to a public records request, the arresting officers knew that General Harris's order to Mr. Lambert and his assault

on Mr. Lambert were unlawful.  As Detective Haueter wrote, "In fact, reporting officer would recommend charges against the General based on my investigation."

43.    Still, as Detective Haueter's report explained, the arresting officers believed that Mr. Lambert and his videographer could be arrested for declining to obey General Harris's order even "[i]f they were wrongfully told to do so."

44.    As the Supreme Court has said, "Obviously, however, one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution." *Wright v. Georgia*, 373 U.S. 284, 291–92 (1963).

45.    After Sheriff McLaughlin and Detective Haueter explained that they didn't care whether Mr. Lambert's arrest would stand up to scrutiny, an OSHP officer asked Mr. Lambert to "talk outside."  Mr. Lambert explained that he was "trying to listen and [General Harris] escalated with me," insisting, "I am doing my job; this is covered by the First Amendment."  At that point, a man who identified himself as a building supervisor joined the crowd and asked Mr. Lambert to leave.

46.    "There you have it," Sheriff McLaughlin said to Mr. Lambert, pointing at the door.  "You're going to make me stand right there?" Mr. Lambert asked, pointing to a room between the doors to the outside and the doors to the gym where his videographer was standing with a member of OSHP.  "You're going to stand outside," Sheriff McLaughlin said, "or you are going to jail."

10

47.  Detective Haueter then grabbed Mr. Lambert by his right arm, Deputy Jennifer Tucker grabbed him by his left arm, and the pair forcibly pushed him out of the door while Mr. Lambert repeatedly objected, "Please do not touch me."

48.  Mr. Lambert objected verbally but offered no physical resistance.

49.  Despite Mr. Lambert's lack of resistance, Detective Haueter and Deputy Tucker bent Mr. Lambert's hands behind his back, took hold of the collar of his shirt, and abruptly shoved him to the ground.  While the officers would later claim that Mr. Lambert had attempted to pull away before the takedown, body camera footage instead shows Detective Haueter and Deputy Tucker swinging Mr. Lambert around, without provocation, when they had already seized his arms.

50.  With Mr. Lambert pinned to the ground, the officers yelled contradictory commands—telling Mr. Lambert both to get on his knees and to lay flat—with which he could not comply.  Detective Haueter and Deputy Tucker continued to shout for Mr. Lambert to get on the ground when body camera footage shows that he was already on the ground.  On video, Mr. Lambert can be heard asking, "I am on the ground, what are you talking about?"  The officers likewise yelled "stop resisting" even as Mr. Lambert offered no resistance.

51.  Detective Haueter and Deputy Tucker then tightly handcuffed Mr. Lambert, while he repeatedly identified himself as a reporter for NewsNation.

## II.     Mr. Lambert Is Detained for Five Hours.

52.     After his arrest, the officers walked Mr. Lambert to a squad car.

53.     Mr. Lambert again repeatedly identified himself as a journalist and asked that he be allowed to continue doing his job covering an important story.

54.     Instead, Mr. Lambert was driven to the East Palestine Police Department, where he was put into metal handcuffs and leg shackles, before he was placed in a Sheriff's deputy's car and transported to Columbiana County Jail.

55.     At the jail, Mr. Lambert was put in an orange jumpsuit, had a mugshot taken, and was forced to turn over all items on his person.  He sat in the reception area for several hours while he was booked for alleged violations of Ohio Rev. Code § 2911.21, which prohibits trespass, and Ohio Rev. Code § 2921.33, which prohibits resisting arrest.  Employees at the jail seemed confused and incredulous at the charges, asking Mr. Lambert to confirm several times that he was a reporter.

56.     Eventually, Mr. Lambert was placed in a small holding cell off the reception area until a representative of NewsNation was able to pay his bond.

57.     All told, Mr. Lambert spent approximately five hours in detention.

58.     After his release, Mr. Lambert had abrasions and bruises on his wrists from his handcuffing and scratches on his neck from the officers' use of force.

59.     Mr. Lambert suffered significant distress as a result of the incident, including weeks of nightmares featuring violent assaults by authority figures.

### III.    Mr. Lambert Is Charged with Offenses He Had Not Committed.

60.    While Mr. Lambert was in detention, the Defendants began spreading a false narrative about Mr. Lambert's actions and his arrest, pushing to have Mr. Lambert prosecuted for offenses that he had not committed.  On information and belief, that campaign was an effort to retaliate against Mr. Lambert for having exercised his right to gather the news and for objecting to their illegal orders.

61.    As a result, Mr. Lambert was charged in Columbiana County Municipal Court with trespass and resisting arrest, even though—as Ohio Attorney General Dave Yost later explained in dismissing the case, on the basis of the same evidence available to Defendants at the time—Mr. Lambert was "lawfully present" at the event, "[h]is conduct was consistent with the purpose of the event and his role as a reporter," and the charges were "unsupported by sufficient evidence."

62.    In false statements to the press and local police about the encounter, General Harris laid the foundation for Mr. Lambert's wrongful prosecution.  In a public statement, General Harris claimed that he told Mr. Lambert to stop recording because his live report was "disrupting the event"; that Mr. Lambert "became enraged" in response and began "aggressively lurching" at him; and that he "instinctively put [his] hands on [Mr. Lambert's] chest" in self-defense.  The statement went on to accuse Mr. Lambert of orchestrating "a contrived event."

13

63.     That narrative was false.  Mr. Lambert's live report posed no risk of disruption, as video shows and the Governor confirmed.  What's more, General Harris never suggested at the time that Mr. Lambert's live shot was interfering with the function of the press conference—only that he found it "rude" and a "shitty move" for a journalist to be broadcasting while the Governor was speaking.

64.     Further, as captured on video of the incident, it was General Harris, not Mr. Lambert, who became enraged and instigated a one-sided physical confrontation.  As Sergeant Matt explained to EPPD, she was forced to place her hands on General Harris's chest to stop him from "going for" Mr. Lambert. Surveillance footage likewise confirms that General Harris stepped forward to shove Mr. Lambert, who was standing still at the time.  And as Detective Haueter's investigative report explained, he believed that criminal charges against General Harris would have been warranted for General Harris's unlawful misconduct.

65.     Finally, Mr. Lambert repeatedly attempted to explain to law enforcement personnel before, during, and after his arrest that he was trying to do his job as a journalist and planned to resume listening to the Governor's remarks. Mr. Lambert did not intend to draw the attention of law enforcement; spoke at an ordinary conversational tone to avoid disrupting the event; and maintained a professional demeanor even after the Defendants had instigated a confrontation.

66.     In a sworn affidavit filed in support of the criminal complaint against Mr. Lambert on February 8, 2023, the day of his arrest, Detective Haueter used General Harris's false statement that Mr. Lambert instigated the encounter to obtain charges against Mr. Lambert.  On information and belief, Detective Haueter knew or should have known that the key elements of General Harris's statement were false because he was present for—and witnessed first-hand—the incident.

67.     To support the charge of resisting arrest, Detective Haueter also falsely asserted that Mr. Lambert "attempted to pull away" and "was attempting to sit up once on the ground."  Mr. Lambert did neither:  He offered no resistance and attempted to comply, but could not have complied, with contradictory commands.

68.     The day after the incident, on February 9, 2023, EPPD issued a press release signed by Chief Brown that amplified General Harris's false account and attempted to justify Mr. Lambert's prosecution.  The press release claimed that Mr. Lambert's reporting was "loud" and had disrupted the event, and that General Harris had only "pushed [Mr. Lambert] away" because Mr. Lambert was "coming at him."  The press release further claimed that Detective Haueter and Deputy Tucker "attempted to escort" Mr. Lambert from the building after "all reasonable means to deescalate" had been exhausted and that, "[w]hile on the ground," Mr. Lambert "was not listening to the officers and was attempting to get up."

69.     Chief Brown knew or should have known that General Harris's recounting of events was false.  For one, by the time of the press release, a member of the EPPD had already spoken with Sergeant Matt, who said she was forced to put her hands on General Harris's chest to stop him from "going for" Mr. Lambert.

70.     Moreover, as Detective Haueter's investigative report explains, EPPD had already obtained footage from the gym—showing that General Harris stepped toward Mr. Lambert to shove him—on February 9, the day the statement issued.

71.     And, as captured on video likewise in EPPD's possession at the time of the press release, in response to Mr. Lambert's explanations that he was attempting to do his job as a reporter, officers immediately escalated the situation by ordering Mr. Lambert out of the gym and threatening him with prosecution.

72.     Finally, as captured on video in EPPD's possession at the time of the press release, Mr. Lambert offered no resistance and had attempted to comply—but could not have complied—with the Defendant officers' contradictory commands.

73.     As a result of Defendants' retaliatory efforts, Mr. Lambert was charged with trespass and resisting arrest in Columbiana County Municipal Court.

74.     On a motion by the Prosecuting Attorney of Columbiana County, the charges against Mr. Lambert were referred to the Special Prosecutions Section of the Office of Ohio Attorney General Dave Yost.  That office quickly concluded the charges were meritless and moved for their dismissal in full on February 15, 2023.

16

75.    As a memo that Senior Assistant Attorney General Anthony D. Cillo prepared—and which was made available in response to a public records request—explained, the charges against Mr. Lambert had "legal deficits."  For one, Cillo observed, Ohio law makes clear that an individual's refusal to leave when ordered cannot support a trespass charge "where, subject to certain time, place, and manner of use restrictions, the defendant is lawfully exercising his or her First Amendment rights." *City of Cleveland v. Dickerson*, 60 N.E.3d 686, 692 (Ohio Ct. App. 2016).

76.    What's more, Cillo observed, a trespass prosecution can only lie where the individual who ordered a defendant to leave "was authorized to preclude [the defendant's] presence" in the first place.  *State v. McGroarty*, No. 96-L-158, 1999 WL 703376, at *3 (Ohio Ct. App. Oct. 31, 1997).  But Governor DeWine—who had invited the press and established the ground rules for the press conference—explained in public statements that he had not authorized anyone to prohibit live shots at the event or to remove Mr. Lambert for conducting one.

77.    In remarks that day, the Governor explained that "a reporter should be allowed to report live or to tape, or whatever they want to do anywhere in this press conference."  He went on to say Mr. Lambert "had a right to be reporting" and "if [he was] in any way hampered from reporting that, that certainly is wrong and it's not anything that I approve of.  In fact I vehemently disapprove of it."

78.     The Governor reiterated as much on February 13, saying "the initial contact" with Mr. Lambert "never should have occurred," telling reporters, "I have the same opinion I had the first day and that is I hope charges will be dropped."

79.     Following a one-on-one interview on February 21, 2023, Governor DeWine likewise told Mr. Lambert that he was sorry for what had happened.

80.     On February 15, 2023, Attorney General Yost announced that all of the charges would be dismissed.  In a press release, Yost emphasized that Mr. Lambert was "lawfully present" and "[h]is conduct was consistent with the purpose of the event and his role as a reporter."  Attorney General Yost went on to underline that "Ohio protects a free press under its constitution" and admonished officials to "exercise a heightened level of restraint" in interacting with journalists.

## IV.  The Violation of Mr. Lambert's Rights Was the Product of Inadequate Policies, Inadequate Training, and the Personal Participation of Key Policymakers in the Decision to Arrest and Charge Mr. Lambert.

81.     As Attorney General Yost's statement indicated, law enforcement interactions with journalists require care to avoid infringing on a free press.

82.     Federal courts have likewise explained in similar contexts that "failures to navigate interactions with reporters properly could frequently cause deprivation of constitutional rights," and that effective policies and training are essential because satisfying the Constitution "calls for more than common sense."

*Martinez v. City of Asbury Park*, No. 20-8710, 2021 WL 1343837, at *6 (D.N.J. Mar. 5, 2021) (citation and internal quotation marks omitted).

83.     The County's and City's policies and training are inadequate, as the experience of Mr. Lambert's arrest—as well as records provided to Mr. Lambert in response to a series of requests under the Ohio Public Records Act—makes clear.

84.     The problem starts at the top.  As set forth above, Sheriff McLaughlin personally participated in ejecting Mr. Lambert and ordering his illegal detention.

85.     Chief Brown, for his part, endorsed the arresting officers' "decision [to arrest Mr. Lambert] and the basis for it."  *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118 (6th Cir. 1994) (citation omitted).  For one, by the time Chief Brown issued his statement, the same evidence that would later lead Attorney General Yost to conclude that Mr. Lambert's arrest was baseless was available to EPPD.

86.     What's more, EPPD's policies on the use of force would have required the arresting officers to immediately notify an EPPD supervisor of Mr. Lambert's violent arrest and generate a detailed report on the circumstances, which would promptly pass up the chain to Chief Brown for review.  EPPD policy further requires Chief Brown or his designee to investigate incidents of force and make a final determination whether an arrest complied with departmental policy and the law.  Chief Brown's statement makes clear that he approved the arrest all the same.

87.     What's more, in response to a request for records for any disciplinary records involving Detective Haueter, Chief Brown responded on April 26, 2023 that none exist—a clear sign that Chief Brown "fail[ed] to meaningfully investigate and punish allegations of unconstitutional conduct" in connection with Mr. Lambert's detention. *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020).

88.     Likewise, in response to a request for records for any disciplinary records involving Deputy Tucker, the Columbiana County Sheriff's Department furnished no records in connection with Mr. Lambert's arrest, evincing the same failure to "investigate and punish allegations of unconstitutional conduct." *Id.*

89.     Policy and training records produced to Mr. Lambert underscore the issue.

90.     For instance, nothing in EPPD's arrest, use-of-force, and media policies informs officers that the First Amendment limits their authority to arrest journalists or issue orders restricting newsgathering in public spaces—even though the law is clear that officials cannot "arbitrarily shroud genuinely newsworthy events in secrecy," *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 560 (6th Cir. 2007) (citation omitted), including through the use of police orders.[1]

_____

[1]     *See, e.g.*, *Enoch v. Hogan*, 728 F. App'x 448, 456 (6th Cir. 2018) (orders that limit newsgathering must comply with the First Amendment); *Reed v. Lieurance*, 863 F.3d 1196, 1211 (9th Cir. 2017) (same); *Turner v. Lieutenant*

*(Cont'd on next page)*

91.     For just that reason, other agencies have policies expressly prohibiting officers from arresting journalists or issuing orders that limit newsgathering in spaces where reporters are lawfully present, with narrowly defined exceptions.[2]

92.     The U.S. Department of Justice has likewise repeatedly warned agencies that "First Amendment violations are the predictable consequence" of a failure to train on "the scope of First Amendment protections" for the press.[3]

93.     EPPD's lack of any policy on the issue, despite the obvious need for one, predictably led to Mr. Lambert's unlawful arrest.  Detective Haueter's report makes express that he believed he could arrest Mr. Lambert for failing to comply with orders restricting his newsgathering even if he was "wrongfully told to do so."

94.     EPPD's policies on the use of less-than-lethal force are likewise inadequate.  They offer minimal guidance on use of the takedown maneuver that

---

*Driver*, 848 F.3d 678, 690 (5th Cir. 2017) (same); *Glik v. Cunniffe*, 655 F.3d 78, 83–84 (1st Cir. 2011) (same).  Ohio law reflects the same principle.  *See* Ohio Rev. Code § 2917.13 (duty to obey lawful orders at emergency scenes shall not be "construed to limit access or deny information" to members of the press).

[2]     *See, e.g.*, L.A. Cnty. Sheriff's Dep't, Policy 3-01/080.16 – Photography, Audio, and Videotaping by the Public and the Press, https://pars.lasd.org/Viewer/Manuals/10008/Content/10397 (last accessed Aug. 3, 2023).

[3]     *See, e.g.*, U.S. Dep't of Justice, Investigation of the City of Minneapolis and the Minneapolis Police Department at 54 (June 16, 2023), https://www.justice.gov/opa/press-release/file/1587661/download; Consent Decree at 27, *United States v. City of Ferguson*, No. 4:16-cv-000180-CDP (E.D. Mo. Mar. 17, 2016), https://www.justice.gov/opa/file/833431/download.

was gratuitously deployed against Mr. Lambert, authorizing officers to "use their knees or shins to control a subject while on the ground . . . consistent with current standards and duty of care" with no elaboration on what those standards in fact are.

95.     That level of detail is deficient for a serious use of force.  The Action Response Continuum included within the policy places takedown maneuvers in the same category of severity as use of a Taser.  But where multiple provisions guide officers' use of Tasers to ensure compliance with the law and the safety of arrestees, no such guidance exists for the takedown that was used on Mr. Lambert.

96.     Those deficits are compounded by the City's inadequate training. EPPD provided responsive records to Mr. Lambert's request under the Ohio Public Records Act for, among other things, all use-of-force training records involving Detective Haueter.  Although these records include a certification and brief assessment Detective Haueter completed as part of a training on the use of *lethal* force, there are no records that Detective Haueter was assessed on the policies on *less-than-lethal* force, including the takedown that was employed on Mr. Lambert.

97.     In principle, Clause 102.64 of EPPD's policy on less-than-lethal force requires EPPD officers to receive annual training and testing on the policies and complete an acknowledgement of them.  EPPD's disclosures contain no indication that Detective Haueter fulfilled this requirement or that EPPD in fact enforces it.

98.    Chief Brown's response to Mr. Lambert's request also explained that the City's existing (inadequate) media policy "requires no annual or recurring training."  There is no indication from EPPD's disclosures that Detective Haueter has received any training or fulfilled any requirements on media relations policy.

99.    The Sheriff's Office's policies on media relations and the use of force, produced in response to Mr. Lambert's request, have the same defects as EPPD's.

100.   The Sheriff's Office media relations and use-of-force policies offer no guidance on First Amendment limits on deputies' authority to arrest journalists or issue orders that limit newsgathering in areas where reporters are lawfully present.

101.   Furthermore, the Sheriff's Office's policies on the use of force are even more deficient on their face than EPPD's policies are, providing no guidance on the use of the takedown that Deputy Tucker employed on Mr. Lambert.

102.   The Sheriff's Office compounds these defects with inadequate training.

103.   There is no indication from its disclosures that the Sheriff's Office requires or enforces training on media relations or the use of less-than-lethal force. Nor does it appear that Deputy Tucker has ever received training in these areas.

104.   Mr. Lambert has continued to cover the aftermath of the derailment. He has written several stories since his arrest,[4] and he traveled to East Palestine two weeks after his arrest for a one-on-one interview with the Governor.[5]  On that beat, he may be asked to attend future events at which officers of EPPD or the Sheriff's Office are likely to be present.  But in light of EPPD and the Sheriff's Office's inadequate policies and trainings, as well as the involvement of key policymaking officials in the decision to arrest and charge him, Mr. Lambert fears that—absent reform—he will again suffer unlawful interference with his rights.

## COUNT I

### 42 U.S.C. § 1983 – Violation of the First Amendment
### (Retaliation)

*Against Sheriff McLaughlin, Deputy Tucker, Detective Haueter,*
*and Chief Brown in their personal capacities*

105.   Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

---

[4]     *See, e.g.*, Joe Khalil & Evan Lambert, *Schumer: NTSB Should Expand Norfolk Southern Investigation*, NewsNation (Mar. 15, 2023), https://perma.cc/2JNH-DFA3; Evan Lambert, Cassie Buchman & Jeanene Splitt, *East Palestine Cleanup Expected to Take 3 Months: EPA*, NewsNation (Mar. 17, 2023), https://perma.cc/43X5-ZX9Q; Evan Lambert, *States Beginning to Raise Concerns About Ohio Toxic Waste*, NewsNation (Mar. 21, 2023), https://perma.cc/YF5J-5Z6L.

[5]     Evan Lambert & Caitlyn Shelton, *'Drink the Water': Gov. Mike DeWine on Ohio Derailment Concerns*, NewsNation (Feb. 21, 2023), https://perma.cc/K9GF-5FV4.

106.    Mr. Lambert was engaged in activity protected by the First Amendment when, in a public forum established by Governor DeWine, he reported on the Governor's press conference regarding the train derailment in East Palestine, Ohio and objected to Defendants' interference with that reporting.

107.    Sheriff McLaughlin, Deputy Tucker, and Detective Haueter's decision to arrest and use force against Mr. Lambert was substantially motivated by his exercise of his right to report the news by broadcasting during the Governor's press conference and his right to object to orders that interfered with his reporting.

108.    Sheriff McLaughlin, Deputy Tucker, and Detective Haueter's decision to arrest and use force against Mr. Lambert was not supported by probable cause or a reasonable but mistaken belief that probable cause existed.  Mr. Lambert's conduct did not disrupt the event and was consistent with his role as a reporter; the purpose and character of the event; and any restrictions issued by Governor DeWine or his authorized agents.

109.    Detective Haueter and Chief Brown's decision to accuse Mr. Lambert of criminal conduct and file charges against him was substantially motivated by his exercise of his right to report the news by broadcasting during the press conference as well as his right to object to orders that interfered with his reporting.

110.    Detective Haueter and Chief Brown's decision to accuse Mr. Lambert of criminal conduct and file charges against him was not supported by probable

cause or a reasonable but mistaken belief that probable cause existed.  Mr. Lambert's conduct did not disrupt the press conference and was consistent with his role as a reporter; the purpose and character of the event; and any restrictions issued by Governor DeWine or his authorized agents.  Mr. Lambert did not resist arrest when unlawfully detained.

111.   Mr. Lambert's arrest, detention, and attempted prosecution would chill a person of ordinary firmness from continuing to exercise his right to gather and report newsworthy information.

112.   In taking these actions, Sheriff McLaughlin, Deputy Tucker, Detective Haueter, and Chief Brown acted under color of state law.

113.   In taking these actions, Sheriff McLaughlin, Deputy Tucker, Detective Haueter, and Chief Brown acted maliciously and with reckless disregard for Mr. Lambert's constitutional rights.

114.   Sheriff McLaughlin, Deputy Tucker, Detective Haueter, and Chief Brown's unconstitutional conduct proximately caused Mr. Lambert physical injury and emotional distress.

## COUNT II

### 42 U.S.C. § 1983 – Violation of the First Amendment
### (Interference with Newsgathering)

*Against General Harris, Sheriff McLaughlin,*
*Deputy Tucker, and Detective Haueter in their personal capacities*

115.    Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

116.    General Harris's order to Mr. Lambert to cease broadcasting burdened his First Amendment right to gather and disseminate newsworthy information.

117.    Sheriff McLaughlin's order to Mr. Lambert to step outside, and the enforcement of that order by Deputy Tucker and Detective Haueter, burdened his First Amendment right to gather and disseminate the news.

118.    None of those actions were "narrowly tailored to serve a significant governmental interest," *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021) (citation omitted), "reasonable in light of the purpose served by" the press conference, *id.* (citation omitted), or viewpoint neutral.

119.    Mr. Lambert's conduct did not disrupt the press conference and was consistent with his role as a reporter; the purpose and character of the event; and any restrictions issued by Governor DeWine or his authorized agents.

120.    The actions of General Harris, Sheriff McLaughlin, Deputy Tucker, and Detective Haueter left Mr. Lambert with no alternative opportunity to report on Governor DeWine's press conference as it was happening.

121.    In taking these actions, General Harris, Sheriff McLaughlin, Deputy Tucker, and Detective Haueter acted under color of state law.

122.   In taking these actions, General Harris, Sheriff McLaughlin, Deputy Tucker, and Detective Haueter acted maliciously and with reckless disregard for Mr. Lambert's constitutional rights.

123.   General Harris, Sheriff McLaughlin, Deputy Tucker, and Detective Haueter's unconstitutional conduct proximately caused Mr. Lambert physical injury and emotional distress.

## COUNT III

### 42 U.S.C. § 1983 – Violation of the Fourth Amendment (False Arrest)

*Against Deputy Tucker and Detective Haueter in their personal capacities*

124.   Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

125.   Deputy Tucker and Detective Haueter arrested Mr. Lambert without probable cause to believe he had violated Ohio Rev. Code § 2921.33, Ohio Rev. Code § 2911.21, or any other provision of law.  Nor did Deputy Tucker and Detective Haueter have any reasonable basis to believe probable cause existed. Mr. Lambert was "gathering news about matters of public importance" and "[his] actions violated neither rules nor laws."  *Enoch v. Hogan*, 728 F. App'x 448, 456 (6th Cir. 2018).

126.   In taking these actions, Deputy Tucker and Detective Haueter acted under color of state law.

127.   In taking these actions, Deputy Tucker and Detective Haueter acted maliciously and with reckless disregard for Mr. Lambert's constitutional rights.

128.   Deputy Tucker and Detective Haueter took these actions with malicious purpose, in bad faith, and in a wanton or reckless manner.

129.   Deputy Tucker and Detective Haueter's unconstitutional conduct proximately caused Mr. Lambert physical injury and emotional distress.

## COUNT IV

### 42 U.S.C. § 1983 – Violation of the Fourth Amendment
### (Excessive Force)

*Against Deputy Tucker, Detective Haueter,*
*and General Harris in their personal capacities*

130.   Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

131.   General Harris instigated a confrontation with Mr. Lambert and forcefully shoved him without provocation.

132.   The force General Harris used was objectively unreasonable in light of the circumstances.  General Harris initiated and escalated his encounter with Mr. Lambert, yelling obscenities at Mr. Lambert and shoving him without provocation.

133.   Deputy Tucker and Detective Haueter grabbed Mr. Lambert by his arms and forcibly pushed him out of the door to the gymnasium.  The officers then bent Mr. Lambert's hands behind his back, took hold of the collar of his shirt, held his neck down, and shoved him to the ground without provocation.

134.   The force used to arrest Mr. Lambert was objectively unreasonable in light of the circumstances.  Mr. Lambert had not committed a crime; did not pose a threat to Deputy Tucker and Detective Haueter; and offered no physical resistance to his arrest.  Mr. Lambert attempted to follow Deputy Tucker and Detective Haueter's instructions but could not have obeyed their contradictory commands.

135.   In taking these actions, General Harris, Deputy Tucker, and Detective Haueter acted under color of state law.

136.   In taking these actions, General Harris, Deputy Tucker, and Detective Haueter acted maliciously and with reckless disregard for Mr. Lambert's constitutional rights.

137.   General Harris, Deputy Tucker, and Detective Haueter's unconstitutional conduct proximately caused Mr. Lambert physical injury and emotional distress.

## **COUNT V**

### **False Arrest**

*Against Deputy Tucker and Detective Haueter*

138.   Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

139.   Deputy Tucker and Detective Haueter intentionally confined Mr. Lambert without his consent when they forcefully restrained, arrested, and detained him.

140.   Deputy Tucker and Detective Haueter arrested Mr. Lambert without probable cause to believe he had violated Ohio Rev. Code § 2921.33, Ohio Rev. Code § 2911.21, or any other provision of law.  Nor did Deputy Tucker and Detective Haueter have any reasonable basis to believe probable cause existed. Mr. Lambert was "gathering news about matters of public importance" and "[his] actions violated neither rules nor laws."  *Enoch v. Hogan*, 728 F. App'x 448, 456 (6th Cir. 2018).

141.   Mr. Lambert was held in custody for approximately five hours.

142.   In taking these actions, Deputy Tucker and Detective Haueter acted maliciously and with reckless disregard for Mr. Lambert's rights and safety.

143.   Deputy Tucker and Detective Haueter took these actions with malicious purpose, in bad faith, and in a wanton or reckless manner.

144.   Deputy Tucker and Detective Haueter's arrest and confinement of Mr. Lambert proximately caused his physical injuries and emotional distress.

145.   At all relevant times, Deputy Tucker and Detective Haueter were acting in the course and scope of their employment.

## COUNT VI
### Battery
*Against Deputy Tucker and Detective Haueter*

146.   Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

147.   Deputy Tucker and Detective Haueter intentionally touched Mr. Lambert without his consent when they forcibly pushed Mr. Lambert out of the door to the gymnasium, bent his hands behind his back, took hold of the collar of his shirt, held his neck down, and shoved him to the ground and arrested him.

148.   The force used against Mr. Lambert was objectively unreasonable in light of the circumstances.  Mr. Lambert had not committed a crime, did not pose a threat to Deputy Tucker, Detective Haueter or others, and did not offer any resistance or attempt to escape.

149.   Deputy Tucker and Detective Haueter's use of force proximately caused Mr. Lambert physical injuries and emotional distress.

150.   Deputy Tucker and Detective Haueter took these actions with malicious purpose, in bad faith, and in a wanton or reckless manner.

151.   At all relevant times, Deputy Tucker and Detective Haueter were acting in the course and scope of their employment.

## COUNT VII

### Malicious Prosecution

*Against Detective Haueter
and Chief Brown in their personal capacities*

152.   Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

153.    General Harris made false statements to the police and public that accused Mr. Lambert of disrupting Governor DeWine's press conference and instigating a physical confrontation that General Harris himself had instigated.

154.    Knowing them to be false, Detective Haueter relied on General Harris's statements in filing a criminal complaint against Mr. Lambert in Columbiana County Municipal Court that charged Mr. Lambert with trespass and resisting arrest.

155.     Detective Haueter's affidavit in support of the complaint further falsely alleged that Mr. Lambert failed to comply with the officers' orders.

156.    Knowing them to be false, Chief Brown echoed and adopted General Harris and Detective Haueter's justifications for Mr. Lambert's prosecution.

157.    No probable cause existed to believe Mr. Lambert had violated Ohio Rev. Code § 2921.33, Ohio Rev. Code § 2911.21, or any other provision of law.

158.    The prosecution of Mr. Lambert terminated in his favor with the dismissal of all charges on February 15, 2023.

159.    Detective Haueter and Chief Brown took these actions with malicious purpose, in bad faith, and in a wanton or reckless manner.

160.    At all relevant times, Detective Haueter and Chief Brown were acting in the course and scope of their employment.

## COUNT VIII

### 42 U.S.C. § 1983 – Violation of the First Amendment

*Against Columbiana County and City of East Palestine*

161.   Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

162.   As set forth in paragraphs 102–120 above, Deputy Tucker, Detective Haueter, Sheriff McLaughlin, and Chief Brown, acting under color of law, violated Mr. Lambert's First Amendment right to gather and disseminate the news.

163.   Sheriff McLaughlin acts as a final decisionmaker for Columbiana County "with respect to decisions to prosecute, charge, and arrest."  *Ghaster v. City of Rocky River*, 913 F. Supp. 2d 443, 470 (N.D. Ohio 2012) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

164.   In that capacity, Sheriff McLaughlin ordered and personally participated in Defendants' retaliation against and interference with Mr. Lambert's newsgathering.

165.   Chief Brown acts as a final decisionmaker for the City of East Palestine with respect to EPPD practices around arrests, training, and discipline, including "policing at the individual level."  *Jackson v. City of Cleveland*, 622 F. Supp. 3d 636, 643 (N.D. Ohio 2022).

166.   In that capacity, Chief Brown ratified the arresting officers' "decision [to retaliate against and interfere with Mr. Lambert's newsgathering] and the basis

for it." *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118 (6th Cir. 1994) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

167.   Defendants Columbiana County and the City of East Palestine maintain inadequate policies on interactions between their officers and members of the press.

168.   Defendants Columbiana County and the City of East Palestine have failed to adequately train their officers on policies and practices that would prevent unconstitutional interference with the newsgathering activities of journalists.

169.   Defendants Columbiana County and the City of East Palestine's inadequate policies and failure to train their officers reflect deliberate indifference to the First Amendment rights of members of the press and public.

170.   Defendants Columbiana County and the City of East Palestine's inadequate policies and failure to train their officers proximately caused the violation of Mr. Lambert's First Amendment rights.

## COUNT IX
### 42 U.S.C. § 1983 – Violation of the Fourth Amendment
*Against Columbiana County and City of East Palestine*

171.   Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

172.   As described in paragraphs 121–134 above, Deputy Tucker and Detective Haueter, acting under color of law, violated Mr. Lambert's Fourth

Amendment right to be free from arrest without legal justification and his right to be free from excessive force.

173.   Sheriff McLaughlin acts as a final decisionmaker for Columbiana County "with respect to decisions to prosecute, charge, and arrest." *Ghaster v. City of Rocky River*, 913 F. Supp. 2d 443, 470 (N.D. Ohio 2012) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)), and has final authority to investigate and impose discipline for unconstitutional arrests and uses of force.

174.   In that capacity, Sheriff McLaughlin ordered Mr. Lambert's arrest and ratified the arresting officers' decision to use excessive force against Mr. Lambert.

175.   Chief Brown acts as a final decisionmaker for the City of East Palestine with respect to EPPD practices around arrests, training, and discipline, including "policing at the individual level." *Jackson v. City of Cleveland*, 622 F. Supp. 3d 636, 643 (N.D. Ohio 2022), and has final authority to investigate and impose discipline for his officers' unconstitutional arrests and uses of force.

176.   In that capacity, Chief Brown ratified the arresting officers' decision to arrest and use excessive force against Mr. Lambert.

177.   Defendants Columbiana County and the City of East Palestine maintain inadequate policies on media relations and the use of force.

36

178.    Defendants Columbiana County and the City of East Palestine have failed to adequately train their officers on media relations and use-of-force policies and practices that would prevent unconstitutional use of force against journalists.

179.    Defendants Columbiana County and the City of East Palestine's inadequate policies and failure to train reflect deliberate indifference to the Fourth Amendment rights of members of the press and public.

180.    Defendants Columbiana County and the City of East Palestine's inadequate policies and failure to train their officers proximately caused the violation of Mr. Lambert's Fourth Amendment rights.

## COUNT X
**Ohio Constitution, Article I, Section 11 – Unlawful Deprivation of Free Speech and Freedom of the Press**
*Against Columbiana County and City of East Palestine*

181.    Mr. Lambert re-alleges and incorporates by reference the preceding paragraphs of this Complaint.

182.    The Ohio Constitution provides that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." Ohio Const. art. I, §11.

183.    Mr. Lambert was engaged in activity protected by Ohio Constitution, Article 1, §11 when, in a public forum established by Governor DeWine, he

reported on the Governor's press conference regarding the train derailment in East Palestine, Ohio and objected to Defendants' interference with that reporting.

184.   Despite the Ohio Constitution's protections for a free press and free speech, Defendants interfered with Mr. Lambert's reporting and arrested him.

185.   Defendants Columbiana County and the City of East Palestine maintain inadequate policies on interactions between their officers and members of the press.

186.   Defendants Columbiana County and the City of East Palestine have failed to adequately train their officers on policies and practices that would prevent unconstitutional interference with the newsgathering activities of journalists.

187.   Defendants Columbiana County and the City of East Palestine's inadequate policies and failure to train their officers reflect deliberate indifference to the rights of members of the press and public as set out in Ohio Constitution Article 1, §11.

188.   Defendants Columbiana County and the City of East Palestine's inadequate policies and failure to train their officers proximately caused the violation of Mr. Lambert's rights under Ohio Constitution Article 1, §11.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Lambert respectfully requests from this Court:

1)      A declaratory judgment that Defendants' conduct complained of herein violated Mr. Lambert's rights under the Constitution of the United States and Ohio law;

2)      An injunction restraining Defendants Columbiana County and City of East Palestine from retaliating against Mr. Lambert for his newsgathering or reporting, interfering with Mr. Lambert's newsgathering without lawful basis, arresting Mr. Lambert without lawful basis, using excessive force against Mr. Lambert, and maintaining the inadequate policies and training practices complained of herein;

3)      General and compensatory damages for Mr. Lambert from Defendants Columbiana County and City of East Palestine for the violations of his rights under federal and Ohio law, including but not limited to pain, suffering, and emotional distress, to be determined according to proof;

4)      General, compensatory, and punitive damages for Mr. Lambert from Defendants General Harris, Sheriff McLaughlin, Chief Deputy Tucker, Chief Brown, and Detective Haueter for the violation of his rights under federal and Ohio law, including but not limited to pain, suffering, and emotional distress, to be determined according to proof;

5)      An award of attorney's fees pursuant to 42 U.S.C. § 1988 and Ohio Rev. Code § 2721.16;

6)    Costs of suit;

7)    Pre- and post-judgment interest as permitted by law; and

8)    Such other and further relief as the Court may deem just and proper.

DATED:    November 13, 2023           */s/ Katie Townsend*
                                       Katie Townsend
                                       ktownsend@rcfp.org
                                       Grayson Clary
                                       gclary@rcfp.org
                                       Emily Hockett*
                                       ehockett@rcfp.org
                                       REPORTERS COMMITTEE FOR
                                        FREEDOM OF THE PRESS
                                       1156 15th Street NW, Suite 1020
                                       Washington, DC 20005
                                       Phone: 202.795.9300
                                       Facsimile: 202.795.9310


                                       */s/ Andrew Geronimo*
                                       ANDREW GERONIMO
                                       andrew.geronimo@case.edu
                                       */s/ Sara Coulter*
                                       SARA COULTER
                                       sara.coulter@case.edu
                                       First Amendment Clinic
                                       CASE WESTERN RESERVE UNIVERSITY
                                       SCHOOL OF LAW
                                       11075 East Boulevard
                                       Cleveland, Ohio 44106
                                       Telephone: (216) 368-2766

                                       Attorneys for Plaintiff EVAN LAMBERT

                                       *\* Pro hac vice application pending*